E. H. LOVE, *et al.*, v. MIAMI LAUNDRY COMPANY

160 So. 32.

Division B.

Opinion Filed May 5, 1934.

On Rehearing January 15, 1935.

138

*Arthur S. Friedman* and *Walter D. Payne,* for Appellants;

*Curry & Ward,* for Appellee.

BUFORD, J.—Appellee exhibited its bill of complaint in the Circuit Court for Dade County seeking to enjoin appellants' from engaging in the service of driving laundry trucks belonging to competitors of the complainant over certain routes in the City of Miami and Dade County, Florida.

The complainant claimed a right to the relief prayed under the terms of certain contracts theretofore entered into between the complainant and each of the defendants. The contracts were separate as to each defendant but were of like tenor and effect. Under the terms of the contract each of the defendants was employed as a driver of a laundry truck operated for and in behalf of the business of the complainant. The pertinent parts of the contracts under which relief is prayed are contained in the 5th and 6th paragraphs thereof, which are as follows:

"Fifth: Said Company may terminate the employment of

said Driver for good and sufficient cause and shall have the right to terminate the employment of said Driver by giving to said Driver one week's notice of the termination thereof or by paying to said Driver such compensation as he would earn in one week's employment; but in no case to exceed Twenty-five Dollars ($25.00). Said Driver may terminate his employment with said Company only by giving to said Company one week's notice in writing, addressed to the party of the first part, of his intentions to quit his employ. Upon any termination of said employment said Driver shall immediately turn over and surrender to said Company all money in his possession belonging to said Company, and shall immediately surrender and give up all books, papers and memoranda pertaining to said Company or its business or its customers, patrons, or agents.

"Sixth: Said Driver agrees that he will not at any time, while in the employ of said Company, either directly or indirectly divulge or make known to any person, whatever, the names or addresses of customers of said Company, who were customers, patrons or agents of said Company, at the time he entered the employ of said Company. That for one year immediately after his discharge by said Company or his quitting the employment of said Company, he will not either directly or indirectly, make known or divulge the names or addresses of any of the customers, patrons or agents of the said Company to any person whatsoever, and that for the space of one year after his discharge or quitting the employment of said Company, he will not either directly or indirectly, either for himself or any other person, firm, company or corporation, call upon, solicit, divert, take away or attempt to solicit, divert or take away any of the custom, business or patronage of such Company upon whom he called or whom he solicited, or to whom he catered or be-

came acquainted with at the time of his employment with said Company or with whom he became acquainted or on whom he called or to whom he catered to after his employment with said Company."

The contract with Love was executed on July 11, 1930; that with J. A. Curry was executed August 15, 1930, and that with T. C. Curry was executed on July 15, 1930.

The record shows that Miami Laundry Company was adjudicated a bankrupt on October 17, 1932; that a Receiver in Bankruptcy was appointed and thereafter each of the defendants continued in the employ of the Receiver in Bankruptcy in the capacity of drivers of laundry trucks until the 13th day of January, 1933, when they resigned to take effect upon the discharge of the Receiver in Bankruptcy. The communications from the defendants to the Receiver were in the following language:

"January 14, 1933.

"To L. M. Geratel and Jack Baldwin, Receivers of the Miami Laundry, Miami, Florida.

"Gentlemen:

"Herewith I tender my resignation as Laundry driver working under you as receiver, effective when you are discharged as said receiver and/or the business turned over to others to operate. If you would see that I am furnished with a release by which I am in no way obligated, I would be glad to continue for an additional week in service to break in a new driver.

"Very truly yours,"

The record shows that the employment by Miami Laundry Company terminated on January 21, 1933.

Motion to dismiss the bill of complaint was overruled.

Testimony was taken and restraining order issued where-

upon appeal was entered and the order appealed from superseded.

The question for us to determine is whether or not a court of equity will grant injunctive relief against a breach of contract of this character. That the contract was made and executed for valuable consideration can not be doubted, but the mere existence of a contract does not mean that in all cases the writ of injunction may be invoked to stop or prevent its breach.

In a case of this kind the public has a vital interest.

Here we have three men, able, ready and willing to perform useful labor and to thereby earn livelihoods for themselves and their families. They have entered into a contract with an employer to perform certain services for that employer. The duration of the employment is not fixed by the contract but either the employer or employee may terminate the contract and after its termination the employee is by the terms of the contract bound for a period of one year not to accept like employment from a competitor covering the territory and serving the customers which were covered and served for the contracting employer. The enforcement of this provision of the contract may, and in all probability will, mean that the contracting employee can not procure other employment and that he, together with his family, will become a charge on the public. It is not necessary that we hold the contract to be invalid as in contravention of sub-paragraph One of Section 5723 R. G. S., 7948 C. G. L., but it is sufficient to say that equity should withhold injunctive relief which is sought for the purpose of coercing specific performance of such contract. After all, the granting of an injunction in such cases is equivalent to an order requiring specific performance of the contract. In a case of this sort the contracting employer should be

relegated to his suit at law for breach of the contract. See Nordenfelt case 6 Eng. Ruling Case, 413; Fredericks v. Mayer, 1st Bosw. (N. Y.) 227; Allen Mfg. Co. v. Murphy, 23 Ont. Law. Rep. 467; Menter Co. v. Brock, *et al.*, 147 Minn. 407, 108 N. W. 553; Johnson v. Hunt, 21 N. Y. Sup. 314, 142 N. Y. 621, 37 N. E. 564; Kaumagraph Co. v. Stampagraph Co., 188 N. Y. 678; Sternberg v. O'Brien, 48 N. J. Equity 370, 22 Atl. 348, 9 A. L. R. 1458.

"That courts are reluctant to uphold contracts whereby an individual restricts his right to earn a living at his chosen calling is well established." Sims v. Burnett, 55 Fla. 702, 46 Sou. 90; Osius v. Hinchman, 150 Mich. 603, 114 N. W. 402; Carrol v. Giles, 30 S. C. 412, 4 L. R. A. 154; Mandevile v. Harmon, 42 N. J. 185, 7 Atl. 37; Herreshoff v. Doutineau, 17 Rhode Island 3, 19 Atl. 712, 33 Am. St. 850.

For the reasons stated, the order appealed from should be reversed and the cause remanded with directions that the bill of complaint be dismissed. It is so ordered.

Reversed.

WHITFIELD, P. J., and BROWN, J., concur.

DAVIS, C. J., and ELLIS, and TERRELL, J. J., concur in the opinion and judgment.

### ON REHEARING

BUFORD, J.—This case is before us after reargument after rehearing granted pursuant to filing of opinion on May 5, 1934.

The conclusion and judgment reached and pronounced is now adhered to.

As other reasons for reversing this case, we think the following are applicable: A court of equity should not lend its power to enforce the provisions of an executory contract against one of the parties unless the terms and conditions of the contract are such that the court of equity might en-

force at least a part of the terms thereof against the other party. In addition to the agreements quoted in the former opinion, the contract contained four other salient provisions, as follows:

*"First:* Said first party hereby agrees to and does hereby employ said party of the second part as a Driver (and in such other capacity as may hereafter be determined by said company) to call for and deliver unlaundered and laundered goods and dry cleaning and other merchandise handled by said company, and to make him acquainted with the customers, patrons and agents of said Company, upon whom said Driver should call.

*"Second:* Said party of the second part agrees to call for and deliver unlaundered and laundered goods, dry cleaning and other merchandise handled by said Company, as he may be directed by said Company, and will account for all merchandise so coming into his hands by reason of this employment, and that he will perform such other and further duties as such Company shall require of him from time to time; that he will use all diligence in his power to make and keep trade for said Company and that he will faithfully work for said Company and drive such trucks as may be directed by said Company; that he will collect the Company's charges for all merchandise entrusted to him for delivery or will return same to said Company; that he will daily turn over to said Company all money collected, and will weekly account for all merchandise entrusted to him for delivery, undelivered and/or uncollected for and keep a just and true account with all customers and said Company; that he will on demand make good any shortages that may appear after being charged with the Company's charges for merchandise entrusted to him for delivery and after being credited with all charges therefor collected and accounted for, and

promptly do and perform any and all things pertaining to the business of said Company as he may be directed to by said Company or its authorized agents or managers.

"*Third:* In consideration of the faithful services to be rendered by said Driver, the Company agrees to allow and pay him weekly, as compensation for the proper fulfillment of this contract, a varying amount arrived at and determined as follows: A sum equal to 15% of cash collected and turned in by said Driver on the first One Hundred Dollars ($100.00) and a sum equal to 10% of cash collected on all cash over said first One Hundred Dollars ($100.00), the same applying on all classes of work done by said Company; said weekly compensation shall be paid by the Company to said Driver immediately after he has made his accounting and remittance to the Company for the preceding week's collections in full. Said Driver shall call upon, solicit from and cater to customers in the City of Miami, Florida, and vicinity.

"*Fourth:* It is mutually understood and agreed that if the compensation or wages of said party of the second part should be changed hereafter, that whatever such compensation or wages shall be if acceptable to the said party of the second part, the same shall be paid in consideration of the covenants and agreements made by said Driver in this Contract, and all of the provisions of this contract shall be equally binding on said Driver and said Company, although the compensation may be mutually changed."

Now by this Contract the Laundry Company agreed to employ the Driver for no definite period. It agreed to pay him a stipulated amount weekly during the continuance of the employment, unless the compensation should be changed by mutual consent. It agreed that the company might terminate the employment of the Driver for "good and suf-

ficient cause." (That was a needless provision because it was the reservation of a right which would have just as fully existed without its mention in the Contract. Mowbray v. Gould 83 App. Div. 255, 82 N. Y. Sup. 202; St. Louis I. M. & S. Railroad Company v. Morgan, 107 Ark. 202, 154 S. W. 519.) And then it is said: "and shall have the right to terminate the employment of said Driver by giving to said Driver one week's notice of the termination thereof or by paying to said Driver such compensation as he would earn in one week's employment; but in no case to exceed Twenty-five Dollars ($25.00)."

Therefore, the Laundry Company agreed to employ the Driver from week to week, paying him a commission on the work which he procured and agreed that it might terminate his services by giving him one week's notice, or by paying him as much as he would earn in one week, not to exceed $25.00. So the Laundry Company bound itself to employ the Driver for no longer period than one week.

It was stated by counsel for the respective parties at the Bar of this Court that the parties to the conract construed the provisions of Section 5 hereinbefore quoted to mean that the employer could for good and sufficient cause terminate the employment without notice and could without cause terminate the employment either on one week's notice or on paying the sum as agreed therein as one week's compensation. That this is a proper construction is borne out by the language of the contract and is supported by the law of construction of such contracts. It preserves the mutuality in this regard, it being provided in the contract that employee may terminate the contract on one week's notice. See Newhall, et al., v. Journal Printing Co., 105 Minn. 44, 117 N. W. 228.

The contract being for no definite period, it constituted

a hiring at will. Greer v. Arlington Mills Mfg. Co., 43 Atl. 609; Boogher v. Maryland Life Ins. Co., 8 Mo. App. 533; Lartora v. Central Fruit Co., 87 N. Y. Sup. 425; Lamibs v. Sloss Iron Co., 118 Ala. 427, 24 Sou. 108; Louisville, etc., Ry. Co. v. Harvey, 99 Ky. 157, 34 S. W. 1069.

The third section of the contract fixes the area in which the employee may be required to work in the following language:

"Said Driver shall call upon, solicit from and cater to customers in the City of Miami, Florida, and vicinity."

By the terms of Section 6 of the contract, and that is the part of the contract here sought to be coerced by injunction, the employee agreed that for one year immediately after his discharge by said company, or his quitting the employment of said company, he will not either directly or indirectly make known or divulge the names or addresses of any of the customers, patrons or agents of the said company to any person whatsoever.

He further agreed: "that for the space of one year after his discharge or quitting the employment of said company, he will not either directly or indirectly, either for himself or any other person, firm, company, or corporation, call upon, solicit, divert, take away, or attempt to solicit, divert or take away any of the customers, business or patronage of such company upon whom he called or whom he solicited or to whom he catered or became acquainted with at the time of his employment with said company, or with whom he became acquainted or on whom he called or to whom he catered after his employment with the said company."

We concede that in many jurisdictions courts of chancery have recognized provisions of this sort in such contracts to be enforceable by the extraordinary writ of injunction,

upon the theory that one who establishes a business is entitled to enjoy the good will thereof and is entitled to the protection of the court of equity from interference therewith by those who have obtained knowledge thereof through employment in the business. But, these courts appear to us to have lost sight largely of the fact that the employee, as well as the employer, is entitled to equitable consideration in a court of equity and to have lost sight of the fact that such contracts are usually dictated by the strong and required thereby to be executed by the weak, that the terms of the contracts are dictated by the employer and required to be executed by the employee who must have employment to provide the necessities of life for himself and his family, and that often these contracts are largely unilateral, providing no obligation on the part of the employer, except to pay the employee that which he actually earns in the performance of the work devolving upon him and, that only so long as the employer sees fit to retain his services.

It occurs to us that a considerable amount of the reasoning upon which courts of equity have based the right to injunction in cases somewhat like this has had its origin in the premises that the employee by reason of his employment had acquired something from the employer in the way of a trade secret which he would for a limited time and in a designated territory be prohibited from using for his own benefit. We do not think such premise is established by the allegations of the bill in this case, or that it was established in many of the reported cases where it has constituted the basis of decisions.

If the driver of a laundry truck gains such friendships and confidence amongst customers that the customers will change laundries when the driver changes employment, it is not because of the use of any property or property rights

of the laundry owner, but is because of the driver's God-given, or self-cultivated, ingratiating personality and to this the employer acquires no property interest. A laundry, or a dairy, or an ice plant, acquires no more special right to the patronage of certain customers than does any other tradesman. The time may have been when the use of steam laundries, milk and ice was so limited that the patrons of such were deemed to be folks apart from the masses and, therefore, an acquaintance with them and list of their names and addresses constituted a thing of peculiar value to the tradesmen who acquired such information, but that day is past, if it ever existed, because the patronage of the laundry and the use of ice and milk is almost universal and in any municipality the city directory is a fair list of customers for such enterprises. So neither the laundry, nor the ice plant, nor the dairyman, of this day may claim any special *property right* in a customer by reason of *discovery.*

So whether equity will lend its arm to enforce the covenants of this contract by the high writ of injunction must depend upon whether or not the contract is so fair and reasonable as to commend itself to a court of equity. We do not deem it to be so. What does the contract bind the employer to do in behalf of the employees in fair and equitable consideration for the covenant here under consideration? The employer has only agreed to pay the employee that which he may earn by his labor and he is in no way bound to continue that employment and payment for more than one week. There is barely enough consideration to make it a binding legal contract and it is so inequitable, oppressive and unfair that a court of conscience should withhold its aid toward its enforcement.

In the case of H. & W. B. Drew Co. v. Harold B. Sanford and Sanford Hall Company, a corporation, 113 Fla.

279, 151 Sou. 545, the complainant, H. & W. B. Drew Company, filed a bill of complaint to enjoin the defendant, Sanford, from engaging in the furniture business in Jacksonville, Florida. The bill alleged, amongst other things, that Sanford had contracted and agreed to work for the complainant for a period of five years at a salary of $5500.00 per year and in that contract of employment "covenanted, contracted and agreed under seal that he would not, either directly or indirectly engage in or be connected with any other office furniture, stationery or office supply business in the City of Jacksonville, Florida, for a period of fifteen (15) years from the date of the aforesaid contract."

Paragraph 3 of the bill of complaint was as follows:

"That, from the commencement of the aforesaid term of employment and during the time and term thereof, the defendant, Harold B. Sanford, was connected with the office furniture, stationery and office supply department of the business of your orator. That because of the nature of said defendant's duties, said defendant came daily into direct, personal contact with the customers of your orator. That this daily, direct personal contact with the customers of your orator caused the customers of your orator to look to and rely upon said defendant to advise with and consult as to their needs in office supplies and office furniture. That it was the habit and duty of said deefndant to call on the customers of your orator, adjust difficulties, keep the customers satisfied, and act as a contact man and as a link between your orator and its customers. That during the time and term of the employment of said·deefndant, the customers of your orator upon whose good will your orator is dependent for the success of the business of your orator, so learned and became accustomed to consult, advise with, rely upon and buy from said defendant that the good will

of the customers of your orator, which is the property and greatest asset of your orator, has become, in a large measure, the good will of said defendant and has attached itself to said defendant personally. That your orator permitted and allowed this condition to arise and to exist because your orator relied on the covenant of the defendant."

Paragraph 4 of the bill of complaint alleges as follows:

"That on, to-wit, the 30th day of June, A. D. 1930, the term of employment of the defendant, Harold B. Sanford, by your orator under the aforesaid contract of employment ended, and since said date said defendant has not been in the employ of your orator."

The bill then alleges that the complainant complied with and performed all and singular the covenants and agreements required of it to be performed, and paid the salary named in the contract for the full period of the contract. The bill then alleged that Sanford was about to engage in the furniture business in Jacksonville in capacity of general manager of the business of Sanford-Hall Company. The contract is attached to and made a part of the bill of complaint. The contract obligates the employer to employ Sanford for a period of five years at a salary aggregating $5500.00 per year. The employee covenanted as follows:

"(A)  To devote his entire time and attention each day during the life of this contract to the performance of his duties for, and to promote the best interest of, the party of the first part.

"(B)  That he will not, directly or indirectly, engage in or be connected with any other business, firm or corporation during the life of this contract.

(C)  That he will not, either directly or indirectly engage in or be connected with any other Office, Furniture, Stationery, or Office Supply business in the City of Jack-

sonville, for a period of fifteen (15) years from the date of this contract."

Demurrer to the bill of complaint was filed by Sanford and a separate demurrer was filed by Sanford-Hall Company. The grounds of demurrer filed by Sanford were as follows:

"1. There is no equity in the bill.

"2. Complainant has a complete and adequate remedy at law.

"3. No basis for injunctive relief appears from the allegations of said bill.

"4. It is not shown that there was any consideration for the alleged restrictive covenant.

"5. The alleged restrictive covenant is for an unreasonably long period.

"6. The alleged restrictive covenant is contrary to public policy.

"7. It does not appear that this defendant has been or will be guilty of any bad faith or unfair conduct.

"8. It is not shown that this defendant is taking any unfair advantage or is making any unfair use of his former employment, or that he will do so.

"9. The alleged restrictive covenant is contrary to Section 7953 of the Compiled General Laws of 1927 of the State of Florida.

"10. It does not appear that this defendant had any good will to sell nor that he possesses any peculiar intellectual or other skill or capacity.

"11. It does not appear that this defendant gained knowledge of any trade secret or secret process of complainant which he is using or can use to complainant's detriment."

Of course, the demurrer admitted all the allegations of

the bill of complaint. The Chancellor sustained the demurrer and dismissed the bill of complaint.

On appeal, this Court affirmed the order and decree of the Chancellor. That was a much stronger case for the complainant in the court below than is presented here.

We measure the reasonableness and fairness of a contract by what may be done under the terms thereof and not by what has been done. We do not hold this contract void but we hold that it is so unfair and unreasonable as between the parties that a court of equity should not enjoin the breach alleged to have been committed by the defendant in the court below.

On rehearing, we adhere to the conclusion and judgment reached in the former opinion and now reaffirm, for the reasons herein stated, the judgment of reversal.

WHITFIELD, C. J., and ELLIS, TERRELL and DAVIS, J. J., concur.

BROWN, J., dissents in part.

BROWN, J. (dissenting in part).—I concur in the conclusion that the temporary restraining order rendered by the court below should be reversed. Not, however, for the reason discussed in the opinions heretofore filed in this case. There are other errors which are, in my opinion, good ground for reversing the case, one of which goes to the admissibility and sufficiency of the evidence upon which the restraining order was based, both as to the breach of the contracts, and the showing of irreparable injury to plaintiff.

On the question of law discussed in the opinions already filed in this case, I am not able to fully agree with all that is said. It must be remembered that there was no effort to enjoin these appellants from working for some one else, or in the City of Miami generally, or elsewhere; it was only

sought to enjoin them from soliciting laundry from the former customers of the Miami Laundry located within the very limited territory which had formerly been served by these appellants, respectively. Thus, the appellant, J. A. Curry, was sought to be enjoined from soliciting and diverting customers from his former employer in that territory in the City of Miami described by boundaries as follows: "North by 36th Street, East by Biscayne Bay, South by 20th Street, West by N. W. 7th Avenue." And similar limited portions of the city were described in connection with the prayer for injunction against the other two appellants.

This suit was filed against three individuals upon three separate and distinct contracts entered into between the Miami Laundry Company and each appellant independently of the other. Each contract was signed both by the Laundry Company, by its President, and by one of the appellants. The introductory portion of the contract made with each of these three parties reads as follows:

"Miami, Fla., July 11, 1930.

"THIS AGREEMENT made and entered into this................ by and between THE MIAMI LAUNDRY COMPANY, a Florida Corporation, party of the first part, also hereinafter called the Company, and E. H. LOVE, party of the second part, also hereinafter called the Driver; both parties being of the County of Dade, State of Florida.

WITNESSETH: That whereas, said Company is and has been engaged in the Laundry, Dry Cleaning and many other kinds and types of Services, and that said Company has built up and established an extensive trade therein; and

"*Whereas,* the principal asset of said business is the good will thereof, consisting of its customers, patrons and agents regularly doing business with said Company; and

"*Whereas,* each of the drivers employed and entrusted by said Company to collect and deliver unlaundered and laundered goods and dry cleaning and other merchandise handled by said Company, is able to learn the names of said Company's customers and patrons and is enabled by such employment to discover and acquire its methods of business in such territory as may be entrusted to him from time to time, commonly known as routes, and

"*Whereas,* said party of the second part is desirous of being employed and entrusted by said Company as a Driver and thereby becoming personally acquainted with the addresses and names of the customers, patrons and agents of said Company and learn the methods of business of said Company; and

"*Whereas,* said Company is willing to employ said second party as such Driver upon certain terms and conditions, and is willing to furnish a truck for his use in such employment,

"Now THEREFORE, in consideration of the premises and the mutual agreements and covenants herein contained, the parties hereto agree as follows, to-wit:"

The validity of covenants by employees, in cases of this particular nature, not to engage in a similar or competing business for a reasonable and definite period of time, within definite limited territory, reasonable in extent, following the termination of their employment, is sustained by the overwhelming weight of the court decisions in this country. Thus, it was said by the writer of the note in 9 A. L. R. 1468:

"It is clear that if the nature of the employment is such as will bring the employee in personal contact with the patrons or customers of the employer, or enable him to acquire valuable information as to the nature and character of the business and the names and requirements of the patrons or

customers, enabling him, by .engaging in a competing business in his own behalf, or for another, to take advantage of such knowledge or of acquaintance with the patrons or customers of his former employer, and thereby gain an unfair advantage, equity will interfere in behalf of the employer and restrain the breach of a negative covenant not to engage in such competing business, either for himself or for another, providing the covenant does not offend against the rule that as to the time during which the restraint is imposed, or as to the territory it embraces, it shall be no greater than is reasonably necessary to secure the protection of the business or good will of the employer."

Numerous decisions are cited by the annotator in support of this statement. The above quoted principle appears to be sustained by the following cases: Eureka Laundry Co. v. Long, 146 Wis. 205, 131 N .W. 412; Axelson v. Columbine Laundry Co. (Colo.) 254 Pac. 990; Owl Laundry Co. v. Banks, 86 N. J. Eq. 230, 89 Atl. 1055; Suburban Laundry Co. v. O'Reilly (Mass.) ,148 N. E. 373; Sherman v. Pfefferkorn (Mass.), 135 N. E. 568; Ideal Laundry Co. v. Guliemone (N. J.), 151 Atl. 617; Brannen v. Bauley (Mass.), 172 N. E. 104; Jennings v. Shepherd Laundries Co. (Texas), 276 S. W. 726; New York Wet Wash Laundry Co. v. Unger, 156 N. Y. S. 598; Eastern New York Wet Wash Laundry Co. v. Abrahams, 160 N. Y. S. 69; J. and J. G. Wallach Laundry System, Inc., v. Fortcher, *et al.,* 191 N. Y. S. 409; Philadelphia Towel Supply and Laundry Co. v. Weinstein, 57 Pa. Sup. Ct. 290; Walker Coal and Ice Co. v. Westerman (Mass.), 160 N. E. 801; Walker·Coal and Ice Co. v. Love (Mass.), 179 N. E. 199; Bettinger v. North Fort Worth Ice Co. (Texas), 278 S. W. 466; City Ice and Fuel Co. v. Snell (Mo.), 57 S. W. (Ed.) 440; City Ice and Fuel Co. v. McKee (Mo.), 57 S. W.

(2d) 443; American Ice Co v. Lynch, 74 N. J. Eq. 298, 70 Atl. 138; Athletic Tea. Co. v. Cole (Mo.), 16 S. W. (2d) 735; Jewel Tea Co. v. Novak, 146 Wis. 224, 131 N. W. 415; Hoops Tea Co. v. James A. Dorsey, 99 Ill. App. 181; Whitkop and Holmes Co. v. Boyce, 112 N. Y. S. 874; Jewel Tea Co. v. Petersen, 200 Ill. App. 157; Erie County Milk Assn. v. Ripley, 18 Pa. Sup. Ct. 28; Mutual Milk and Cream Company v. Prigge, 98 N. Y. S. 458; Mutual Milk and Cream Co. v. Heldt, 105 N. Y. S. 661. See also 32 C. J. 220-221; 67 A. L. R. 1002; 52 A. L. R. 1363; 20 A. L. R. 861; 31 L. R. A. (NS) 249; 24 L. R. A. (NS) 933.

As to the validity and enforceability of a stipulation by a purchaser of a trade or business that he will not exercise the same trade or business so as to interfere with the value of the trade or business purchased, see Massari v. Selciccio, 102 Fla. 847, 136 So. 522, in which the case of Lee v. Clearwater Growers Assn. 93 Fla. 214, 111 So. 722, was cited with approval.

It would seem therefore that the enforceability of contracts of this nature is determined by the reasonableness of the contract and the restraint imposed, as being necessary to the legitimate protection of the employer's business. That a customer's list is, in a case of this kind, valuable property of the employer is evident, and for an employee to use for his own or another's benefit his knowledge of such a list as pertains to the limited territory in which he has been working, to the detriment of the interest of his former employer, is generally held to constitute a species of unfair competition. To hold these contracts unenforceable would be to allow an unscrupulous competitor to greatly injure or destroy a rival business, and, incidentally, throw many people out of work. Empire Steam Laundry v.

Lozier, 165 Cal. 95, 130 Pac. 1180; New Method Laundry Co. v. McCann (Cal.), 161; Colonial Laundries v. Henry (R. L.) 138 Atl. 47; Dairy Dale Co. azevedo, (Cal.) 295 Pac. 10; Olschewski v. Hudson, (Cal.) 262 Pac. 43; French Bros. Bauer Co. v. Townsend Bros. Milk Co., et al., (Ohio) 152 N. E. 675.

In one of the briefs filed in this case our attention has been called to the fact that such contracts as the ones here involved are in accord with code provisions which have been adopted and promulgated under the authority of the National Recovery Act; that the code of distributors of milk in Dade and Brevard Counties contains the following:

"It shall be considered unfair practice to do any of the following things in the conduct of the milk business in the Miami Marketing Area:

"Sixth Clause:

"(3) To place an employee in a territory which within 12 months previously he has covered as milk delivery salesman for another firm, person or corporation."

"This Code was adopted by a majority of the distributors of the area and is under the control of the Florida State Milk Control Board.

"Again, in the Chicago Marketing Agreement for Milk, the license issued by the Secretary of Agriculture, United States Department of Agriculture, United States Department of Agriculture, provides in part:

" 'The following practices are considered unfair and shall not be engaged in * * *

" '16. It shall be considered unfair. practice to place a salesman on a route, which within one year previously he had covered in whole or in part for another distributor.'

"As shown by the cited authorities, the milk business is exactly the same as the laundry business in this respect.

Provisions of this type have been approved by the President of the United States himself. That they are embodied in the Codes show their urgent necessity and utterly disprove the contention that such a provision is against public policy in any form."

In the case of Eureka Laundry Co. v. Long, *supra,* a case closely in point, the Supreme Court of Wisconsin said:

"The first question raised by the appeal is the validity of the portion of the contract set out in the foregoing statement of facts wherein the defendant agrees during the term of his employment and for two years thereafter not to solicit laundry trade from any customers of the plaintiff who have been supplied by him during his employment, and for two years thereafter, either directly or indirectly, engage in the laundry business in that part of Milwaukee known as 'Route B.' Were this a case where the defendant had sold the plaintiff the laundry business and had made the covenants above referred to, no question as to the validity of the contract would arise under the decisions of our own state. Cottington v. Swan, 128 Wis. 321, 107 N. W. 336; My Laundry Co. v. Schmeling, 129 Wis. 597, and cases cited on page 606, 109 N. S. 540. It meets all the requirements of the rule laid down in Tecktonius v. Scott, 110 Wis. 441, 86 N. W. 672, to the effect that such contracts, in order to be valid must be limited as to time, space, and extent of trade, to what is reasonable under the circumstances of the case, and it is much more limited as to time and space than the contract held valid in Cottington v. Swan, 128 Wis. 321, 107 N. W. 336.

"The question raised, Does it make any substantial difference whether the thing of value bargained for is contained in a contract of sale or in a contract of hiring? If it is lawful and proper to protect a business just about to

be acquired from certain acts by the seller who is familiar with such business, why is it not equally lawful and proper to protect an established business from such acts by one who has become familiar therewith? We perceive no difference in principle. The purchaser says to the seller: 'You are familiar with this business. You know your customers. Your personal acquaintance with them is such that you could divert their trade from me if you saw fit. Now I will purchase your business upon the express condition that you will agree for a limited length of time not to engage in a like business in this locality. At the expiration of that time I shall know my business and my customers well enough to be able to protect myself.' So the owner of an established business says to a prospective employee: 'In the employment you will become familiar with the customers of my business in a way that I cannot. You will meet them frequently, while I see them rarely, if ever . Now, I will hire you upon the express condition that you will agree for a limited length of time not to solicit trade from such of my customers as you may have supplied while in my employ, and will not engage in my business within a limited time in the territory you have occupied. At the end of that time my new employees will be sufficiently well acquainted with my customers to protect my business.' Why is not one contract as valid as the other? Both are based upon valuable considerations. If it be said that the latter contract tends unreasonably to hamper employees in their quest for employment, the answer is: Whatever is reasonably necessary for the protection of a legitimate business promotes the best interest of the employees of that business. No doubt experience has shown that owners of a business like that of plaintiff need such protection in a large city, where the customers as a rule come in contact only with the em-

ployee, and that his personality and his acquaintance with them has much to do with the retention of their patronage. Freedom to contract must not be unreasonably abridged. Neither must the right to protect by reasonable restrictions that which a man by industry, skill, and good judgment has built up be denied. If the restrictions are not otherwise contrary to public policy, they must be held to be valid when they appear to be reasonably necessary for the fair protection of the employer's business or rights, and do not unreasonably restrict the rights of the employee, due regard being had to the subject-matter of the contract, and the circumstances and conditions under which it is to be performed. My Laundry Co. v. Schmeling, 129 Wis. 597, 109 N. W. 540; Gibbs v. Consolidated Gas Co., 130 U. S. 396, 9 Sup. Ct. 553, 32 L. Ed. 979; Anchor Electric Co. v. Hawkes, 171 Mass. 101. 50 N. E. 509, 41 L. R. A. 189, 68 Am. St. Rep. 403; Harrison v. Glucose Sugar Refining Co., 116 Fed. 304, 53 C. C. A. 484, 58 L. R. A. 915.

"'If the restrictive covenants of the contract are held valid, it is apparent that an action at law, for their breach, would no more furnish an adequate remedy than would an action at law for the breach of similar covenants in a contract for the sale of a business. That equity alone can furnish an adequate remedy in such cases is well settled. My Laundry Co. v. Schmeling, 129 Wis. 597, 109 N. W. 540.'"

For the reasons above pointed out, I am unable to agree that a contract of this nature, when fair and reasonable as to time and territory, is contrary to public policy and unenforceable in a court of equity.

The only feature of the contracts here in question which give me any doubt on the subject of their enforceability in equity is the fact that they do not provide for the employment of appellants for any particular period of time, inas-

much as they were subject to termination on one week's notice, either by the employer or the employee. It is true that this is a point which the authorities do not appear to give any weight to. But the fact that these appellants had been in the employment of the Miami Laundry Company for several years at the time they left that company and went into the employment of a rival company indicates that there was no intention on the part of the Miami Laundry Company to throw them out of employment without just cause.

There is nothing in the contract here involved which unduly invades the liberty of the employee, such, for instance, as a provision which would preclude the employee from joining a labor union or quitting the employment of the Laundry Company and going to work for some other company whenever he got ready, provided he gave the same one week's notice to the Laundry Company which the Laundry Company would have to give to him in case they decided to discharge him.

Nor is this a case where some strong gargantuan industrial corporation is attempting to oppress the weak. The record in this case shows that the Miami Laundry Company had been in business in Miami for over twenty years; That it had, throughout that period, made some money each winter and lost money each summer, with the exception of the summers of 1925 and 1926; that it managed to survive the collapse of the boom, but like many other similar industries, it went on the rocks when the devastating depression had been in full swing for awhile and finally wound up in the bankruptcy court. So I gather from this record that here we are dealing with one of those many small industries, independently operated, not as a part of a chain of some gigantic system, but as a single unit, which is merely

attempting by a contract with its employees to make a reasonably necessary and legitimate effort to protect and preserve its own business from unfair competition. The bill did not seek to enjoin the former employees from solictiing and obtaining customers for the rival company anywhere else in the City of Miami or State of Florida except as to that route and those customers within the described limited territory in Miami which they had been serving as employees of the old company when they quit its employment. Self preservation is the first law of nature, and the power to make fair and reasonable contracts to that end should not be denied to those industries of the nature here involved, which while they afford some profit to their owners, likewise furnish employment to such a large number of people in this State. I hardly think, therefore, that it lies within the province of this court, in the absence of any legislation on the subject, to hold that such a contract is contrary to public policy, or to deny the only adequate remedy for its enforcement, when the aid of equity is sought on proper pleadings and proof.

I heartily agree that contracts of this nature should be carefully scrutinized by the courts, and whenever they are unreasonable, or impose undue hardship upon the employee, a court of equity should not lend its aid to their enforcement. Nor should they be enforced unless there is a clear showing that the loss to the employer is irreparable and his remedy at law inadequate. And the burden is upon the employer to show both the necessity for, and the reasonableness, of the contractual restraint which he seeks to enforce.

DAVIS, J. (concurring).—My view of the law of this case is best expressed in the following quotation from the Supreme Court of Texas in the case of Oak Cliff Ice. Del. Co. v. Peterson (Tex. Civ. App.), 300 S. W. Rep. 107, where the court said of a similar controversy:

"The validity of the covenant in question, both as to the assigned and adjoining territory, depends upon its terms being necessary for the preservation of both the business and good will of the appellant after the termination of the employment, and if such covenant imposed a greater restraint on the appellee than was necessary to secure such protection, to that extent same is unenforceable as being contrary to public policy. The necessity for the covenant, as well as its reasonableness, must rest upon the services rendered by appellee to appellant under his employment, in the conduct of its business, and be confined to the territory in which appellee operated in the performance of his duties as such employee. In the enforcement of such covenants, courts will diligently and with a jealous care inquire into the necessity for and the reasonableness of same to the end that those who through necessity must labor to earn a livelihood will not be placed at the mercy of those who do not so have to toil, for otherwise a condition of industrial servitude might be developed. The right to labor is inherent, being enjoined by the very existence of the human family, and the freedom of the laborer to put forth his best efforts to justly enlarge his sphere of operation, usefulness, and income, should never be interfered with or restricted save and except by that which is within and for the public good, or within a sound public policy. Therefore, full and satisfactory proof should be required of the litigant having the burden of proof to establish the necessity for, and the reasonableness of, covenants restricting such inherent right to labor."

This Court itself in Simms v. Burnette, 55 Fla. 702, 46 Sou. Rep. 90, has heretofore adopted a similar rule which is to the effect that a court of equity will not intervene to enforce specific performance *negatively* by enjoining breach

of a restrictive labor covenant, where it is made to appear that the contract is harsh and oppressive in favor of the employer against the employee, or is otherwise lacking in fairness or mutuality of obligation between the parties to it.

If the employee, while working for a new employer, should undertake to get for his new employer his former employer's patronage by creating the impression on his former employer's customers that he is still with the company whose business he no longer represents, then he might be subject to injunctive interference to prevent such unfair competition, to an extent necessary to suppress such unfair activities. But that would be the granting of injunctive relief upon a different principle—and not a negative specific enforcement of an inequitable contract by injunction. See Gottdiener v. Joe's Restaurant, 111 Fla. 741, 149 Sou. Rep. 646, for a discussion of the latter principle.

I therefore concur in the opinion and conclusion on rehearing.