Peter Vamvaks v. Commissioner. C. Limmiatis v. Commissioner.
Vamvaks v. Commissioner
Docket Nos. 6070, 6071.
United States Tax Court
1945 Tax Ct. Memo LEXIS 123; 4 T.C.M. (CCH) 733; T.C.M. (RIA) 45247; June 30, 1945
Douglas D. Felix, Esq., Congress Bldg., Miami, Fla., for the petitioners. Edward L. Potter, Esq., for the respondent. MELLOTT
Memorandum Findings of Fact and Opinion MELLOTT, Judge: The Commissioner determined the following deficiencies in income tax: 1940
1941
Peter Vamvaks
$14,451.87
$1,438.27
Constantine Limmiatis
13,883.41
1,059.83 The deficiencies for 1941 are not contested. Each petitioner claims that the deficiency for 1940 is erroneous and that he is entitled to a refund. The overpayments alleged to have been made are $3,447.93 by Vamvaks and $3,647.64 by Limmiatis. The sole question in each case is: What was the amount of taxable gain realized from the complete liquidation of Riverside Laundry & Linen Supply, Inc., one-half of the stock of which was owned by each petitioner? *124 Other adjustments made to the net income reported are not contested. Findings of Fact Petitioners are residents of Miami, Florida. Their income tax returns for the year 1940 were filed with the collector of internal revenue for the district of Florida and the taxes shown to be due were paid in the amounts and on the dates as follows: Vamvaks
Limmiatis
March, 1940
$1,575.22
$1,837.17
June, 1940
1,575.22
1,986.57
September, 1940
1,575.22
1,762.47
December, 1940
1,575.22
1,762.47
$6,300.88
$7,348.68
During the year 1921 petitioners began the operation of a laundry business in Miami, Florida, as partners, which business was continued in that form until 1929, at which time petitioners exchanged the assets of the partnership for all of the stock of a corporation known as Riverside Laundry & Linen Supply, Inc. The aggregate cost of the partnership assets was $22,205.39. Each petitioner received twenty-five shares of the capital stock of the corporation upon its organization. On December 31, 1940, the assets of the corporation were transferred to petitioners in exchange for their stock and in consideration of their assuming its liabilities. From *125 that date to the date of trial the laundry and linen supply business theretofore conducted by the corporation has been operated by a partnership composed of the two petitioners. The known liabilities of the corporation assumed by the petitioners amounted to $124,879.65. The book value of the tangible assets received by them amounted to $223,354.86, as shown in the following schedule: Assets
Cash on Hand and in Banks
Cash on Hand
$ 345.00
First National Bank
9,700.04
$ 10,045.04
Accounts Receivable
Customers - Schedual
$31,013.28
Routemen - Schedule
6,175.76
Loans - Schedule
2,188.86
Notes - Schedule
6,326.49
Mrs. C. Limmiatis
1,043.81
Mrs. P. Vamvaks
968.25
47,716.45
Inventories
Materials
$ 2,000.00
Linen
17,500.00
19,500.00
Total Quick Assets
$ 77,261.49
Deferred Assets
Interest Accrual
$ 125.50
Deposits Utilities Schedule 5
225.00
Unexpired Insurance
798.63
Prepaid Rent
300.00
Advance Payroll
25.71
Prepaid Improvements
10,353.05
Total Deferred Assets
11,827.99
Fixed and Other Assets
Cost
Res. Depr.
Furn. and Fixt.
$ 5,833.54
$ 1,492.43
Trucks and Autos
42,075.46
24,298.78
Plant Mch. and Equip.
102,454.59
48,866.17
Dry Clean Equip.
15,142.85
3,756.18
Boiler
17,695.89
3,354.82
Cafeteria
1,415.65
203.21
Boat
560.98
145.99
Heater
4,017.46
577.74
Water Softener
3,564.45
512.37
$192,760.87
$83,207.69
$109,553.18
General Machinery and Supply Co. Stock
125.00
Due from Officers
C. Limmiatis
$10,735.47
P. Vamvaks
13,851.73
24,587.20
Total Fixed and Other Assets
134,265.38
Total Assets
$223,354.86
*126 The real estate on which the plant of the laundry was and is located, including the building in which the assets of the corporation were housed, was owned during the year 1940 by the wives of the two petitioners. This property had been acquired by the wives as a gift from petitioners in 1937. The real estate was leased to the corporation under short-term leases. On December 31, 1940, the lease then in effect had three years remaining in the term. There was no provision in the lease giving the corporation a right to renew it. The item carried on the balance sheet of the corporation as "Prepaid Improvements" in the amount of $10,353.05 represented, improvements made by the corporation on the building in which it conducted its business and to the adjoining land. The adjoining land was owned by the wife of Limmiatis. Prior to making the improvements, the land had buildings on it from which the owner was receiving rent; but she agreed to allow the corporation to use the land at the same rent which she had been receiving from the property. She refused, however, to expend any sums in demolishing the buildings or in making the improvements which the corporation desired. The corporation, *127 therefore, razed the buildings, put in a driveway, built a marquee over the driveway and improved the office. Among the assets shown on the books of the corporation was a note receivable from J. Galatis in the amount of $5,000. This note represented a loan of $5,000 made, without security, as an accommodation to an old customer for the purpose of enabling him to complete the construction of a restaurant. Subsequent to December 31, 1940, this note was paid. On December 31, 1940, the corporation had two boilers which had a book value on that date of $14,341.07. The more expensive of the two boilers had been purchased in about 1938 at a total cost, including installation, of between $10,000 and $11,000. It was a new and untried make; and after being installed it proved to be so inefficient that it was, for all practical purposes, unusable in the laundry business. Manufacture of this particular type of boiler has since been discontinued and petitioners no longer use it except temporarily when it is necessary to inspect or repair the old boiler. The earlier partnership, the corporation, and the present partnership has each been, and the latter still is, engaged in the business of *128 washing and dry cleaning lines and garments of customers and supplying linnes to other customers. The business of supplying lines to customers made up approximately 40 percent of the corporation's gross business, while approximately 45 percent consisted of laundering linens which belonged to commercial users such as hotels and restaurants. The remaining 15 percent of the corporation's business consisted of laundry work for individuals and families. During the year 1940 and for many years prior thereto the laundry and linen supply business with commercial users in the City of Miami, Florida, and surrounding localities had been obtained on a competitive basis. It was necessary for the corporation and the partnerships to solicit the customers almost constantly and to make price concessions in order to keep business in the plant. Petitioner personally, especially Limmiatis, called upon some of the larger commercial users to obtain their business. With respect to hotels and apartments the laundry work of guests was obtained largely through the management. In many instances, such work was secured on the basis of the amount of commission allowed to the management on the guests' laundry. *129 Business was also obtained by entertaining persons who were solicited for commercial laundry and linen supply business. Such persons were sometimes the owners of the apartment house or hotel but frequently were the managers or housekeepers, depending upon who had the authority to make laundry contracts for the establishment. In some instances even bellboys were contacted. Contracts for the winter season's business (the most profitable period) were usually made with the commercial users in the fall; however, such contracts were oral, were not considered to be binding on either party and could be terminated at will. Family laundry service and a large proportion of the commercial laundry and linen supply business in the Miami area is controlled by routemen, who deal directly with the majority of the customers. Family customers, to a large extent, followed their particular routeman, regardless of which laundry happened to be employing him at the time. When the routeman changed employers the customers' business generally went to the new employer. Commercial customers, also, were diverted to a routeman's new employer when, as was frequently the case, the new employer gave the routeman *130 a higher commission, which enabled him to make greater price concessions. Several laundries in the Miami area had developed their business by "stealing" drivers from other laundries and thereby acquiring many of the other laundries' customers. The experience of laundry operators in the Miami area has demonstrated that family and commercial customers frequently do not continue to patronize a laundry simply because of excellence of service. Several sales of laundries in the Miami area have been made prior to, during and since the year 1940. In none of them was good will considered to be a factor in determining the purchase price, it being the opinion of experienced laundry operators that good will did not exist in the laundry business in Miami, Florida. The linen supply business in the Miami area, during 1940, was conducted in substantially the same manner, under the same conditions and with the same disadvantages as the commercial laundry business, with the exception that the competition was keener in the linen supply business. In the State of Florida a laundry cannot make an enforcible contract with a routeman not to work for any other laundry within a reasonable time over the *131 same route after he has ceased to be an employee of it. (Love v. Miami Laundry Co., Supreme Ct. of Florida, May 5, 1934, rehearing January 15, 1935, 160 So. 32; Nettles v. City Ice & Fuel Co., idem., January 30, 1935, 160 So. 42.) The net profit (or loss) of Riverside Laundry & Linen Supply, Inc., for each of the ten years immediately preceding 1941 was as follows: 1931
$ 5,317.44
1932
(1,016.76)
1933
(2,880.17)
1934
26,902.54
1935
13,272.46
1936
18,489.56
1937
23,994.54
1938
39,438.86
1939
42,230.77
1940
30,803.34
In determining the deficiencies in tax the Commissioner held that Riverside Laundry & Linen Supply, Inc., had distributed good will to petitioners, the value of which he computed as follows: Net Tangible Assets
Year
Jan. 1
Dec. 31
Average
1936
$19,267.81
$ 19,954.06
$ 19,610.93
1937
19,954.06
25,822.18
22,888.12
1938
25,822.18
36,313.98
31,068.08
1939
36,313.98
75,634.21
55,974.10
1940
75,634.21
101,505.86
88,569.54
Five year total
$218,110.77
EARNINGS
Year
Total
Income Tax
Net
1936
$23,351.77
$4,862.21
$ 18,489.56
1937
30,730.28
6,735.77
23,994.53
1938
48,259.60
8,820.74
39,438.86
1939
52,136.75
9,905.98
42,230.77
1940
40,530.70
9,727.36
30,803.34
Five year total
$154,957.06
Less: 10% of tangible assets
21,811.08
Profit due to intangibles
$133,145.98
Average per year
$ 26,629.20
$26,629.20 capitalized at 16 2/3%
$159,775.20
Each petitioner's interest, 50%
79,887.60
Capital gain, 50%
$ 39,943.80
*132 In their income tax returns for 1940, each petitioner reported the amount of $18,304.75 as dividends received from the Riverside Laundry & Linen Supply, Inc. The Commissioner eliminated this amount from the income of each petitioner and added to the income of each a long term capital gain of $59,891.42. He made the following explanation of this adjustment: (a) It is held that you realized a long-term capital gain of $119,537.84 upon the dissolution of the Riverside Laundry & Linen Supply, Inc., and that one-half of that amount, or $59,768.92 is includible in your taxable income. The fair market value of the tangible assets of the Riverside Laundry & Linen Supply, Inc., as a going concern, on December 31, 1940, was $210,000. The corporation on that date had no good will or other intangibles having a fair market value. Opinion The last finding is dispositive of the sole issue. The parties do not dispute that the shares of stock of Riverside Laundry & Linen Supply, Inc., owned by petitioners at the time of its liquidation on December 31, 1940, had cost $22,205.39 and that in connection therewith petitioners assumed liabilities aggregating $124,879.65. Our determination of the *133 fair market value of the assets received by them from the corporation, therefore, provides all of the factors necessary to make a computation of the taxable gain realized by each. The parties agree that any gain realized represents a long-term capital gain, 50 percentum of which is to be taken into account. (Section 117 I.R.C.) At the trial six witnesses were called by petitioners, who expressed opinions as to the fair market value of the corporation's assets at the time they were distributed in liquidation. All of them had had considerable experience in the laundry business in Miami and surrounding communities in Florida, and most of them had personal knowledge of, or had participated in, the purchase or sale of businesses similar to that acquired by petitioners from their corporation. The witnesses testified at length to the seasonal nature of the laundry and linen supply business in Florida, the rapid turnover in customers, the importance of making personal contacts with commercial users such as managers of hotels and restaurants, and to the control which the routemen exercised over the customers which they served. The substance of their testimony is embodied *134 in our findings and will not be repeated. It is sufficient to say that the evidence convinces us that, because of the unusual conditions existing in Miami and surrounding communities, a purchaser of a laundry and linen supply business would have no assurance that he would acquire anything usually embraced in the term "good will," which would give him "a reasonable expectation of preference in the race of competition." In re Brown's Will, 249 N.Y. 1, 150 N.E. 581. The witnesses were unanimous in stating that, even though a Miami laundry operated at a profit, its good will had no fair market value because of the highly competitive nature of the laundry and dry cleaning business in the vicinity, the rapid turnover of customers necessitating constant solicitation and the inability, under Florida law, of making binding contracts with routemen which would prevent them from taking the customers on their routes from one laundry to another in the same territory. They also agreed that family and commercial customers were influenced in their selection of a laundry by solicitation and by the routemen far more than they were by the type of service furnished by the laundry. Several *135 of them were familiar with voluntary sales of laundry businesses which had been made in "the greater Miami area" and testified that no amount had been included in the sales price for good will even though those laundries had been operating at a profit. One witness, who had been in the laundry business for 20 years, testified: Q. Is it your opinion that a laundry which is operating at a substantial profit is worth no more than a laundry operating without a profit? A. Definitely worth no more. The new operator may not be as good an operator as the old one or may be a better operator. I could buy a plant that is making a lot of money and start losing money. I may not be as good an operator, or I could be a better operator and make more money. Only one witness, an internal revenue agent, was called by the respondent. He determined by the mathematical formula set out in our findings, sometimes referred to as the "capitalization-of-earnings methods," that the value of the good will of the corporation on December 31, 1940, was $159,775.20. While this method of demonstrating the value of good will has often been applied by this tribunal, a condition precedent to its application is that *136 it must appear good will actually exists. The testimony of the witnesses, however, has convinced us that none existed at the time the corporation was liquidated. Hence a finding to that effect has been made. It follows that no increase in value of the assets may be approved, in so far as it is based upon the value of good will. Petitioners have requested a finding that the fair market value of the assets shown on the balance sheet of December 31, 1940, was not in excess of $182,649.49. This, they point out, was "the average going concern value of all the witnesses who made an appraisal." The witnesses were chiefly operators of laundries in the Miami area. None of them had made an appraisal of the assets until shortly before the trial. Each attempted to make an appraisal as of December 31, 1940. The values fixed by them ranged from $178,917.12 to $185,120.65. Limmiatis, testifying as a witness, fixed the value at between $180,000 and $185,000. The value fixed by the stockholders and partners at the time of the liquidation of the corporation and when litigation with reference to its accuracy was not imminent is substantial evidence of its true market value. Moreover, it is significant *137 that neither of the petitioners testified catgorically that the fair market value of any particular asset was less than shown on the exhibit with the exception of the item listed as "property improvements" - marque and driveway erected on the adjoining property - the boiler which had cost between $10,000 and $11,000 and the Galatis note of $5,000. Under cross-examination, however, Limmiatis admitted that the Galatis note had been paid in full; so it is doubtful if any deduction should be made in the total value of the assets because of it. The witnesses, other than petitioners, all accepted the values shown on the balance sheet for cash on hand and in banks, inventories, amounts due from petitioners and fixed assets, with but minor exceptions. One witness expressed the opinion that the accounts receivable, aggregating $47,716.45, should be discounted at least 25 per cent. One expressed the view that the cafeteria was worthless because he "wouldn't have it in a laundry." One stated he doubted that the automobiles had been worth, on the date shown, the depreciated value at which they were carried. One fixed the value of the boat at $200 instead of $415 as shown. All agreed, however, *138 that the boiler was not worth the amount shown on the balance sheet and all expressed the opinion that the improvements made on the adjoining lot were without value. Careful consideration has been given to all of the testimony and conclusion has been reached that the fair market value of the total assets on the basic date was $210,000. No attempt need be made to rationalize this conclusion. It follows that the deficiencies determined will be set aside and overpayments in tax will be allowed if shown to be due in a recomputation. Decision will be entered under Rule 50.