## REAM v. CALLAHAN.
### No. 213.

Circuit Court of Appeals, Second Circuit.
May 12, 1943.

William B. Butler and John Kadel, both of New York City, for appellant.

Thomas R. Hart, Jr., and McDermott & Turner, all of New York City, for appellee.

Before L. HAND, SWAN, and FRANK, Circuit Judges.

L. HAND, Circuit Judge.

This appeal is from a judgment in the defendant's favor upon a motion under Rule 12(c), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, for judgment on the pleadings; it involves only the validity of the complaint which was in substance as follows. On February 1, 1919, the plaintiff's testator and the defendant, who were practicing dentists, entered into a contract (later amended by another contract on January, 1, 1922), in pursuance of which they "became associated" in practice. From October 1, 1921, to October, 1924, the defendant received one third "of the net receipts" of the practice, and on October 1, 1924 he "became a fifty (50%) percent owner in, and received a fifty (50%) percent interest in said practice and dental equipment * * * and received fifty (50%) percent of the profits of said practice until September 30, 1937." He ended his "association" with the testator on October 1, 1937, went into practice as a dentist in Brooklyn on his own ac-

count, sent notices to the testator's patients, and tried to "divert" the practice to himself, all in breach of a covenant contained in the contract, which restrained him from competing with the testator for a period of three years after he severed "association" with him. The complaint asks damages for this breach.

The contract provided that in consideration "of the contracts hereinafter contained for his services and the compensation to be paid therefor * * * being more than it otherwise would be on account of clauses 3, 4 and 5a," the defendant agreed "to work for" the testator "as a specialist in Oral Surgery and Radiography * * * for five years." The defendant would "do everything in his power to promote the interests" of the testator "during all the time he may be in his employ" and "will conform to the regular rules and hours of the office." In the third article he promised not to "carry on, or be employed or concerned in the practice" of dentistry in Brooklyn "for the space of three years from the day" he "ceases to be employed by" the testator, which is "to date from the last day" he "actually works for" the testator "whether the term of service be more or less than that set forth in this agreement." In the fourth article he agreed "that whenever he leaves the service of" the testator he will not send notices to his patients or try to divert business from him. In the fifth article the testator promised "in consideration of the services to be performed * * * and of the covenants and agreements herein contained" to pay "the sum of $1,040 for the first half year, or $40 per week, and $1,300 for the second half year, or $50 per week, of the term of service—mentioned in clause 1 of this agreement—" about $60 a week for the second year, $70 for the third, $79 for the fourth and $88 for the fifth. Article Va provided that at the end of five years the defendant would "accept a one-third interest of the net income in" the testator's "practice in Brooklyn instead of a stipulated salary, said compensation or one-third interest to be at least $5000 per year. At the expiration of eight years; one half interest in dental practice and dental equipment." The contract concluded with a provision that "for any wilful breach of this agreement, or neglect to perform his duties * * * or for any gross immoral or intemperate conduct" the testator should "have the right to discharge" the defendant who should "not be entitled to any further

compensation hereunder." The later contract of January 1, 1922, provided that from October 1, 1921, the defendant was "to receive * * * one-third of the net receipts of said practice * * * for a period of three years" and if he "faithfully carries out the conditions as mentioned in the contract above dated February 1919, he shall then become a fifty percent (50%) owner in said practice and dental equipment." "The remaining terms and conditions of the former contract * * * remain in full force and effect with the exception of the change mentioned in this supplementary agreement regarding income."

The only question is whether the restrictive covenant should be limited to the period before the defendant became "a fifty percent (50%) owner in said practice and dental equipment," as the amendment of January 1, 1922, put it. Before analyzing the language itself, it is well to consider the situation in which the parties found themselves on September 30, 1937. For thirteen years they had been "associated" as equal "owners" of the practice. The defendant had served an initial apprenticeship of about five and a half years; for over two years of that period upon a weekly wage, thereafter upon an interest in the net profits, given "instead of a stipulated salary," and guaranteed to be $5000. Presumably he had "faithfully carried out" his share of the bargain, and proved himself fit to be an equal "owner". No period was assigned to this association, and either one could have dissolved it at will; the covenant which allowed the testator to "discharge" the defendant had therefore become brutum fulmen on October 1, 1924. If the defendant still remained subject to the covenant, dissolution of the relation would have ruined him. Unable for three years to continue in Brooklyn, the place in which by hypothesis he had built up the only practice he had, he would have lost most of his patients before he could begin to build anew. His interest in the "dental equipment" would have been of little value to him if he had been obliged to move it to Manhattan, or to let it stand idle for three years. It is one thing to take the chance of "discharge" during a period of limited probation; but quite another to live always at the peril of losing whatever years one may put into a business after one has proved his ability, and been accepted as an equal. Add to this that it was the testator who drew up the contract and chose the language, and we start with a strong bias against the plaintiff's interpretation.

Coming next to the language used it is apparent that the third and fourth articles do not naturally apply to the relations of the parties after the defendant had served his apprenticeship, and become an equal owner in the business. Whether or not he then became a partner, stricti juris, we need not decide, though we really have no doubt that he did. However that may be, after October 1, 1924, he stood on an equality with the testator as to profits and as to ownership, and it would be a distortion of ordinary usage any longer to speak of him as in the testator's "service," or as "working for," or "employed by," him. And this conclusion is put beyond fair question, when we consider that all these words fit precisely upon the probationary period. That that period lasted through the three years—October 1, 1921 to October 1, 1924—during which the defendant no longer worked for wages, there can be no doubt. The fixing of a minimum and the statement that the one-third interest was to be "instead of a stipulated salary" are enough to show that it was part of the apprenticeship; and this is confirmed by the interpolation of the word, "owner," in the agreement of January 1, 1922, to characterize the last phase of their relations. Textually we have therefore a choice between confining the covenant to a period to which its diction fits perfectly, and extending to one, to which it is not too much to say that it does not fit at all.

For these reasons we hold that the testator meant only to protect himself over a period of eight years—later reduced to about five and one half—against an untried assistant who might come into his office, become acquainted with his clientele; but, turning out to be unsatisfactory, might be discharged. Obviously the testator would not wish to expose himself to competition of such a person, which might be serious—for patients are not good judges of medical ability, and can often be captured meretriciously. But that he should have meant to hold over the head of one whom he should have tried and found to be fitted to share in the business on equal terms the power to cripple, if not to destroy, all that he had contributed to building up the common good-will: that seems to us not only unreasonable in itself, but beyond the scope of the words which he

himself chose. The "employment," the "service," the "work," all ended on October 1, 1924; so did the contract; it had ended in a full-fledged cooperative equal association—call it what one will. Thereafter the obligations of the parties would depend no longer upon the contract but upon whatever implications the law would impute to the relation. Finally, there is substantial authority for saying that the law does not look with an auspicious eye upon such restrictions anyway; they are against "common right," and doubts are to be resolved against a latitudinarian construction. Hunt v. Held, 90 Ohio St. 280, 107 N.E. 765, L.R.A.1915D, 543, Ann.Cas.1916C, 1051; Granger v. Craven, 159 Minn. 296, 199 N. W. 10, 52 A.L.R. 1356; Bowers v. Whittle, 63 N.H. 147, 56 Am.Rep. 499.

Judgment affirmed.