J. STERLING ADAMS, APPELLANT, V. WILSON T. ADAMS ET AL., APPELLEES.

58 N. W. 2d 172

Filed April 10, 1953. No. 33282.

*Baskins & Baskins* and *V. H. Halligan.* for appellant.

*Beatty, Clarke, Murphy & Morgan,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

BOSLAUGH, J.

The object of this suit in equity brought by appellant is to prevent appellees Wilson T. Adams and Adams-Swanson Funeral Home, a copartnership, from violating the obligation of a written contract prohibiting Wilson T. Adams from setting up and establishing for a stated time and within a limited area a business competitive with the business of appellant.

The basis for the relief as pleaded by appellant is that he and Wilson T. Adams, one of the appellees, were from July 14, 1947, until February 3, 1951, members

of the Adams Funeral Home, a copartnership; that the partnership agreement provided that if appellee ceased to be a member of the partnership that he would not set up or establish a new or competitive business in North Platte for 10 years thereafter, directly or indirectly, for himself or in association with others; that if he violated the agreement in this regard it was agreed the damages to appellant would be $10,000 which he could recover by an appropriate action; that appellee caused the Adams-Swanson Funeral Home to be organized with Gladys Adams, the wife of appellee, and Kenneth A. Swanson as the nominal partners; that he financed it, put it in the undertaking and funeral business, has participated in the conduct of its business, and has been active in all of its engagements and activities; that it is a subterfuge employed by appellee to engage in the undertaking and funeral business and to attempt to avoid the terms and effect of the noncompetitive provision of his contract with appellant; and that he has by this instrumentality been conducting that kind of business since July 7, 1951, in competition with the Adams Funeral Home of North Platte, owned and operated by appellant, but he has not paid or offered to pay appellant the $10,000 named in the covenant involved in this case.

Appellees deny the claims of appellant except they admit the restrictive covenant including the provisions thereof for damages and nonpayment of any amount by appellee to appellant, and they allege that Gladys Adams and Kenneth A. Swanson are the members and only members of the Adams-Swanson Funeral Home.

Appellees moved at the conclusion of the introduction of the evidence in chief of appellant that the petition be dismissed. The district court sustained the motion, and dismissed the petition and the suit. A motion of appellant for new trial was denied and he has prosecuted this appeal.

The issue is whether or not the evidence accepted as

true and all reasonable conclusions deducible therefrom are sufficient to sustain a judgment for appellant. This must be decided as a question of law by a trial de novo on the record. Busteed v. Sheffield, 153 Neb. 253, 44 N. W. 2d 471.

Appellant has been in the undertaking business in North Platte since 1934. He was a partner of Fred Hutchins until September of 1939. They operated as Hutchins-Adams Funeral Home. Hutchins retired and appellant continued as Adams Funeral Home until July 14, 1947, when he and his brother Wilson T. Adams, herein identified as appellee, became partners and carried on the business by the name Adams Funeral Home. Appellee had taken instruction in embalming and mortuary work and he on occasions assisted at the Hutchins-Adams Funeral Home when its business required additional help. He was employed by appellant for full-time work at the Adams Funeral Home in July 1945. He continued in that capacity until he and appellant became partners. Appellee withdrew from the partnership on February 3, 1951. He took his license and personal belongings, left the place of business without warning or notice when appellant was absent, and he did not return to it or offer to participate in its activities thereafter.

The contract of July 14, 1947, between appellant and appellee in reference to the Adams Funeral Home contains this provision: "It is further agreed that as part of the consideration of this agreement that if at any time in the future the second party (appellee) shall sever relations with this co-partnership that he will not set up and establish any new or competitive business in the city of North Platte and within three miles thereof for a period of ten years from and after the termination of said co-partnership, either directly, indirectly, for himself or in association with other persons, and in the event that the second party does so set himself up any business and compete with the first party, then it is

agreed that the damages inuring to the first party shall be in the sum of Ten Thousand Dollars, which the first party may recover by appropriate action for the breach of this Agreement."

About mid-year of 1950, appellee and Mr. Benson, an employee for several years of the Adams Funeral Home who assisted in the conduct of its undertaking business, considered going into business in Kimball. About January 1, 1951, appellee proposed to Benson that they establish a funeral home in North Platte. They talked about it on numerous occasions, sometimes at the Adams Funeral Home, and sometimes at the Adams home in the presence of Mrs. Adams and Mrs. Benson. They considered two locations. Appellee before February 3, 1951, presented Benson a floor plan of a home in North Platte and discussed the prospect of establishing a funeral home there. The place under consideration afterwards became the place of business of the Adams-Swanson Funeral Home. The last conversation between appellee and Benson concerning the matter of starting a funeral home was in March or April, 1951, when Benson advised appellee he could not engage in the venture because he could not secure the necessary funds. Benson knew of the restrictive covenant in the contract involved in this case. He and appellee discussed it in the presence of Mrs. Adams, and appellee stated "that the contract had been broken and that it didn't mean a thing."

Appellee or his wife by telephone solicited Kenneth A. Swanson in March 1951, soon after Easter that year, to come from York to North Platte for the purpose of considering engaging in the funeral home business in that city. He had not met or had knowledge of appellee or his wife. Swanson and his wife came to North Platte, met appellee and Mrs. Adams, and had a general discussion of matters. He stayed a day and a half, reached no decision, and made no commitment.

About 2 weeks thereafter Swanson was advised by

appellee or his wife by telephone about property that "we could possibly get hold of" and they would like to have him come up and look at it. He came, examined the property, and decided to go into business with Gladys Adams if they could buy the property; if Mr. Trego, her brother-in-law, who Swanson met on his first trip to North Platte would loan the money required for a down payment; and if Swanson could sell his home in York.

Swanson later came to North Platte when "they said the papers were ready to be executed or signed." The articles of copartnership of the Adams-Swanson Funeral Home were signed on May 1, 1951. The purchase agreement for the property where the funeral home is located named Gladys Adams as purchaser, was made on April 8, 1951, and the persons present during the transaction were the real estate man, appellee, Gladys Adams, and Mr. Trego. The deed of the property from Keith Neville and his wife to Gladys Adams is dated April 16, 1951. The purchase price was $21,500. It was paid with the proceeds of a loan of $11,800 made by a loan association of Cozad, Nebraska, and secured by a first mortgage on the property, and a loan of $10,000 made to Gladys Adams by Mose Trego secured by a second mortgage on the property. The first mortgage and the note secured by it were executed by Gladys Adams and appellee. The note to Trego was signed by Gladys Adams and Kenneth A. Swanson and the mortgage securing it was signed by them and appellee. J. L. Case, the father of Gladys Adams, loaned her $7,000 evidenced by a note signed by her and her husband and secured by a second mortgage on their home. Swanson borrowed $6,000 from Mr. Case and invested it in the funeral home. Gladys Adams on May 1, 1951, conveyed one-half of the property purchased from Neville where the Adams-Swanson Funeral Home is located to Swanson and he assumed payment of one-half of the indebtedness secured thereon. Trego knew that appellee could not "open a business; that he couldn't operate it."

Appellee has assisted and participated in the work of the Adams-Swanson Funeral Home since it has existed. He has been at its place of business for this purpose practically every day. The home of appellee is connected by telephone with the funeral home so that a call to it can be answered at his home, and he has received and answered calls there. He is a licensed embalmer, has done embalming, and assisted in it for the funeral home. He has answered ambulance calls. He has shown and sold merchandise including caskets at the place of business. He has taken or gone with the members of the family or friends of a deceased to the cemetery and made arrangements for the purchase of a cemetery lot, for preparing the place of burial, and for the service at the cemetery. He acted in this respect on the occasion of the first undertaking and funeral engagement the funeral home had in July 1951, and the last one it had before this case was tried in June 1952. The home had 44 funerals in which interments were made in the North Platte cemetery during that period and appellee acted for the home in these matters in about three-fourths of them. He has done the things usually performed by a funeral director at more than half of the funerals conducted by the home and has had some part in many more than that. He has had no other business or employment and no income.

In the latter part of 1951 in a conversation between the superintendent of the cemetery and the appellee, he stated to the superintendent that business was good and he was busy. At another time when appellee, Swanson, and the superintendent were at the cemetery the superintendent advised them of the decision of the cemetery board to discourage Sunday funerals, and that it desired the cooperation of the undertakers to discontinue Sunday services as much as they could. Appellee stated that they could not discourage Sunday funerals even if "the board had passed on that and made a regulation to that effect." In June 1952, when

Mrs. Moulton was at the cemetery and purchased a lot incident to the death of her husband, she inquired if she should pay the purchase price of the lot to the superintendent of the cemetery and appellee answered her: " 'No. You can pay us and we will take care of it all in one bill.' "

The business of the Adams Funeral Home has had a decrease of 25 to 30 funerals a year since the Adams-Swanson Funeral Home started and a large percent of the funerals conducted by it were for members of families previously served by the Adams Funeral Home.

Gladys Adams has operated a nursery school and this has engaged her time a part of 3 days each week. She was not educated, trained, or experienced in mortuary work or in conducting funerals. Swanson knew this before he made any commitment in North Platte. During the time she was at the place of business she did some book work, acted as hostess, helped with the arrangement and removal of flowers, and directed people when funerals were conducted at the home. She also did some arranging of hair and manicuring of fingernails in preparing bodies for burial.

Swanson and Gladys Adams each knew of the noncompetitive provision of the contract involved in this case before they did anything in reference to the Adams-Swanson Funeral Home.

Appellee has not contributed or invested any money in the funeral home and has not made to it any contribution of property, equipment, or anything of value except the voluntary, gratuitous assistance he has furnished as above stated. There has been no agreement or understanding of any kind between him and the Adams-Swanson Funeral Home or between him or either of the members thereof. He has no ownership of the property or the business of the partnership or any part thereof, and no right of management, control, or direction of its affairs or any of them. It is not shown that he has attempted to exercise any such right; that he has in any

way held himself out as a party interested in its property, business, or affairs; or that he has solicited patronage for the home. He has received no compensation or money from the partnership and there is no showing that he has or claims the right to do so. The individual withdrawals from its funds have been by Swanson and Gladys Adams.

Appellees present as a defense that this suit is not cognizable in equity; that appellant has an adequate remedy at law; that he and the appellee by their contract agreed that in the event of a breach of the negative provision thereof prohibiting appellee from competing in business with appellant the damages to him would be $10,000 and could be recovered in an appropriate action by him; and that if this restriction has been 'violated appellant may by an action at law recover the amount as stipulated by the parties.

The case of· Tarry v. Johnston, 114 Neb. 496, 208 N. W. 615, was a suit in equity involving the violation of a contract for the sale of property and a business in which it was provided that a violation of the contract by the purchaser obligated him not to practice medicine for a stated time within a radius of 150 miles of Omaha, and permitted the sellers to retain as liquidated damages all payments made on the purchase price of $40,000 and 10 percent of the net profits of the business for a period of 5 years. There had been paid thereon about $25,000. Violations of the contract were alleged and plaintiffs sought an adjudication permitting a retention by them of all payments of purchase money as liquidated damages, and an injunction to prevent the purchaser Johnston from practicing medicine and surgery during the time and in the area provided by the contract. A defense was that the suit in equity was not maintainable because if the contract had been breached the plaintiffs had an adequate remedy at law. The decree therein permitted the plaintiffs to retain the money paid to them as liquidated damages and enjoined

Johnston from practicing medicine and surgery for the time and within the area stated above. In affirming the judgment of the district court it was said by this court: "The first question for consideration is the jurisdiction of a court of equity to grant the relief sought by plaintiffs. On this point defendants insist there is a total lack of proof that they are insolvent or that they are unable to respond in damages or that they cannot pay their notes. They argue, therefore, that the suit in equity is not maintainable. In this connection reference is made to evidence tending to show that defendants at various times paid in money items aggregating $24,724.26 on the purchase price. They take the position that a court of equity cannot properly forfeit that sum and at the same time restore the sanitarium and business to plaintiffs and enjoin Johnston from practicing his profession. This point, though ably presented, does not seem to be conclusive. Whether the case is one of equitable cognizance depends upon the peculiar facts disclosed by the record. If the contract is valid in all its parts equity is clearly a proper remedy."

In Personal Finance Co. v. Hynes, 130 Neb. 547, 265 N. W. 541, it is said: "A contract restricting employment in a competitive business for one year within the city, or the environs or trade territory, imposes reasonable conditions and is valid and enforceable. * * * In such a case a court of equity has jurisdiction to protect the plaintiff's right, notwithstanding the fact that the contract provides for liquidated damages." The court in the opinion noted the inadequacy of an action at law in such a situation by the use of this language: "The remedy at law thus provided is not adequate. The defendant, within the first year after the termination of his employment, is capable of doing irreparable damage. At that time, his relation with the customers of the plaintiff is close and unbroken. An action at law would furnish only partial relief."

Hickey v. Brinkley, 88 Neb. 356, 129 N. W. 553, was

a suit in equity to enjoin the sellers of real estate and a business located thereon from violating the provisions of an agreement made at the time of the transaction in the form of a bond with a penalty in the sum of $500 which after reciting the fact of the sale provided that the sellers would not engage in competition with the business sold or permit anyone under their control to do so in a described area for a period of 10 years from the date of the sale. A violation by the sellers of the provisions of the agreement was alleged. A permanent injunction was granted plaintiffs. This court said: "The defendants urged that there is no equity in the bill, for the reason that plaintiffs have an adequate remedy at law by an action on the bond, that the amount of money named therein as a penalty was intended as liquidated damages, and that since no insolvency has been shown the only right of action for a violation of the contract is one at law for the amount named in the bond. We think this position is untenable." See, also, Gable v. Carpenter, 136 Neb. 669, 287 N. W. 70.

The test of equity jurisdiction is generally the absence of an adequate remedy at law. An adequate remedy at law is one that is practicable and efficient to the ends of justice and its prompt administration as the remedy in equity. The remedy at law is not adequate if the situation requires and the law permits preventative relief, as preventing the repetition or continuance of wrongful acts. Richardson Drug Co. v. Meyer, 54 Neb. 319, 74 N. W. 575; Nebraska Telephone Co. v. Cornell, 58 Neb. 823, 80 N. W. 43; 19 Am. Jur., Equity, § 110, p. 115; 30 C. J. S., Equity, § 25, p. 347.

An action for an injunction may be maintained to prevent a breach of a valid restrictive covenant not to engage in a competing business without regard to the presence of a provision for liquidated damages in the event of a breach of the covenant, and the injured party may recover in the action as an incident of it any damages he is legally entitled to because of default in

performance of the obligations of the covenant. See, Brchan v. Crete Mills, 155 Neb. 505, 52 N. W. 2d 333; Gable v. Carpenter, *supra.*

Appellees urge the belief that the noncompetitive provision involved was intended to and does mean that Wilson T. Adams could, if he ceased to be a member of the Adams Funeral Home, set up, establish, and operate a new or competitive business by paying to appellant before he engaged therein the amount stated in the covenant or if he did not make the payment appellant could recover that amount from him; and that the restrictive covenant was not intended to and does not obligate him not to acquire and operate in North Platte an undertaking and funeral business, but was only intended to and does bind him to pay the amount stated if he does that. This is not a logical, natural, or permissible interpretation. The very essence of the covenant is "that he (Wilson T. Adams) will not set up and establish any new or competitive business in * * * North Platte * * * after the termination of said co-partnership * * *." The matter of damages is incidental to the prohibition imposed. Appellee attempts to use as a shield the very provision appellant obtained for his protection. A reading of the entire covenant in connection with the situation of the parties to it at the time it was made convinces that the intention was what the plain language expresses, that is, that the terms of it should be performed and not that the covenantor should only become liable for damages upon a violation and that he was not obligated to desist from competition with appellant. A somewhat similar situation and contention was appropriately and convincingly discussed in Hickey v. Brinkley, *supra,* as follows: "We are further of the opinion that the very purpose of this contract would be defeated if the person selling the business was allowed to pay the sum named in the bond as a penalty and then be at liberty to destroy the business which he sold and take away the good will of the vendee. The intention

of the parties was to guard against the property sold becoming valueless to the purchaser by reason of the seller again resuming business in that locality. It is not reasonable to suppose that the purchaser of the business intended that if the seller would pay him $500 he would be at liberty at any time to break his contract. and enter into competition with him in the same business." See, also, Tarry v. Johnston, *supra;* Personal Finance Co. v. Hynes, *supra;* A. Finkenberg's Sons, Inc. v. Adest, 203 App. Div. 631, 197 N. Y. S. 246.

A contract which imposes partial restraint upon the exercise of a trade, business, or occupation is not unreasonable when it is ancillary to an actual transaction involving property, business, or employment made in good faith and is necessary or appropriate to afford fair protection to the one in whose favor the restriction is made. Such a contract will be respected and enforced. C. W. Swingle & Co. v. Reynolds, 140 Neb. 693, 1 N. W. 2d 307; Stanford Motor Co. v. Westman, 151 Neb. 850,. 39 N. W. 2d 841. However the law does not look with favor upon restrictions against competition, and an agreement which limits the right of a person to engage in a business or occupation will be strictly construed and will not be extended by implication or construction beyond the fair or natural import of the language used. Courts are inclined to resolve doubts concerning violation of a covenant of this class in favor of the party upon whom the restraint is imposed. Ream v. Callahan,. 136 F. 2d 194; Love v. Miami Laundry Co., 118 Fla. 137, 160 So. 32; Saddlery Hardware Mfg. Co. v. Mills, 68 N. H. 216, 44 A. 300, 73 Am. S. R. 569; Tarr v. Stearman, 264 Ill. 110, 105 N. E. 957; Streichen v. Fehleisen, 112 Iowa 612, 84 N. W. 715, 51 L. R. A. 412; Simmons v. Johnson (La. App.), 11 So. 2d 710; Schlossbach v. Francis-Smith, 3 N. J. Super. 368, 65 A. 2d 560; Arthur Murray Dance Studios v. Witter, 62 Ohio L. Abs. 17, 105 N. E. 2d 685; Annotation, L. R. A. 1918E 666; 36 Am.. Jur., Monopolies, Combinations, etc., § 57, p. 537.

The charges of appellant that appellee organized and set up the Adams-Swanson Funeral Home; that he furnished money and credit for the establishment of it; that it was financed solely by his credit and money; that Swanson furnished no finances in the establishment of it; and that it was furnished for the purpose of appellee engaging in the undertaking business in violation of the contract with appellant constitute indispensable elements of the cause of action alleged by appellant. Evidence is lacking to support a finding of their truth. There is no evidence of any fact justifying the conclusion that appellee had anything to do with organizing or putting the partnership in business. Contrary to what appellant says, the fact appears without dispute that Swanson put $6,000 into the partnership and bound himself for the payment of one-half of the indebtedness or $10,750 secured on the real estate bought for and used as a place of business of the funeral home. There is no showing that the partnership was formed or that its property is used for the purpose of permitting appellee to violate his contract by setting up and establishing a prohibited business. There is no evidence that appellee financed the business in whole or in part. The fact that Gladys Adams borrowed money and appellee signed with her papers necessary to permit her to secure the money when the loans were made to her does not support the claim that appellee financed the partnership. If he had furnished financial assistance to his wife that would not have constituted setting up and establishing a new or competitive business within the provisions here under consideration. In Gallup Electric Light Co. v. Pacific Improvement Co., 16 N. M. 86, 113 P. 848, the court said: "Under a contract not to engage in business in competition with the purchaser of property, the party bound is not precluded from loaning money to others, even though they may use it to embark in business in competition with the purchaser." See, also, McKeighan Wachter Co. v. Swanson, 138 Wash. 682, 245 P. 10; Simmons v. Johnson,

*supra;* Sineath v. Katzis, 218 N. C. 740, 12 S. E. 2d 671; Annotation, 93 A. L. R. 139; 36 Am. Jur., Monopolies, Combinations, etc., § 73, p. 550.

It was lawful for Gladys Adams to use her name in organizing and engaging in the undertaking business as an individual or as part owner if she did it in good faith. She could identify herself as Gladys Adams or Mrs. Adams or simply as Adams. If by the use of her name she injured the business of appellant more than if she adopted some other name she committed no wrong. She or Swanson was not bound by any covenant not to commence or acquire a competitive business. § 42-203, R. R. S. 1943; Plattsmouth State Bank v. Bauer & Co., 133 Neb. 35, 274 N. W. 204; Fleckenstein Bros. Co. v. Fleckenstein, 66 N. J. Eq. 252, 57 A. 1025.

Owen v. Willis (Tex. Civ. App.), 20 S. W. 2d 338, concerned a contract by which Clyde Owen sold an undertaking business including physical assets and good will to Willis and the seller agreed not to engage in such business for a stated time in a described area and not to be employed directly or indirectly in a like business by any person during that time. Thereafter the wife of the seller was instrumental in opening a competitive business in the name of a brother of Clyde Owen. He employed the wife of Clyde Owen as an assistant in the conduct of the business. It was claimed by the purchaser that Clyde Owen was the real owner of the new business, and that it was commenced and operated as a fraud and a subterfuge. The court said: "Since Mrs. Owen was not a party to the contract between her husband and appellee, her employment by her brother-in-law is in no sense a violation of the contract unless the conduct of the business by Bill Owen and her employment as an assistant are shown to be a fraud and a subterfuge. No evidence was introduced sustaining the allegation of fraud * * *. She therefore had the right to accept personal employment from her brother-in-law, and an injunction should not be granted in the absence

of evidence sustaining the allegations in the bill."

The obligation of appellee was that he would not set up or establish a business competitive with appellant. This may not be construed as including or prohibiting voluntary, gratuitous services rendered by him to his wife in her similar business carried on in her name and that of another. The words set up and establish import a proprietary interest and right of control or right of management. Fleckenstein Bros. Co. v. Fleckenstein, *supra*. Appellee did not contract that he would not engage in, enter into, or have anything to do with an undertaking business in North Platte. He only bound himself not to set up or establish a competing business in that city.

In General Baking Co. v. Soles, 18 Del. Ch. 343, 162 A. 58, the court said: "Salesman's agreement not to 'accept employment' from competitive concern in same territory, held not to preclude engaging in competitive business as principal." The obligation of the salesman was that he would not accept employment from or for any competitive concern or product for 1 year after the termination of his services for General Baking Company. Within that time he sold the same class of products produced by a competitor of the General Baking Company, his former employer, to its customers on the route served by him when he was in its employment, and he solicited its customers generally to buy from him. He was then engaged in business for himself as proprietor. The question the court decided was whether his act in going into and conducting a business for himself constituted a breach of the covenant not to accept employment from or for a competitive concern or product. This language was used in deciding there was not a breach of the obligation of the contract: "If the contract in question prevented the defendant from engaging in the business directly or indirectly, it may be conceded without deciding that the injunction should issue. Such however is certainly not its express language. * * * This defendant

is not however engaged as an employee. The question here is whether the agreement does not by its language limit the restraint upon the defendant solely to his working as an employee for another. If so, there can be no justification for restraining him from acting as the proprietor of the business. Certainly it is competent for the parties to restrict their agreement to a prohibition that the former employee shall not act as employee for another, leaving him free to act on his own behalf as principal. In examining the contract with the view of ascertaining its meaning, I know of no rule of construction which would allow the court to conjure up a purpose to be served by the contract, and then, having imagined the purpose, twist the plain import of the language actually employed into serving that purpose * * *. What the complainant seeks to have the court do is to assume first, that the purpose of this agreement was to protect the complainant from all competitive conduct on the part of the defendant * * * and then hold that the language * * * expresses an intent as broad as the assumed purpose. This ignores the fact that the language used may have been expressly designed to protect the complainant from the competition of the defendant in only a restricted degree."

Railway Audit & Inspection Co. v. Pendleton, 175 La. 4, 142 So. 781, concerned an alleged breach of a provision that restrained defendant from engaging in a competitive line of business in a named territory for a stated time after he left the employ of plaintiff. The court made this observation: "Contracts such as the present should be strictly construed, since they have a tendency, at best, to interfere with one in earning a livelihood, even when they do not exceed legal bounds. There is a difference between entering into a line of business similar to another and in competition with it and accepting employment from a person or corporation conducting such business. Viewing the contract strictly, it does not prohibit plaintiff (defendant) from accepting

employment in a competing business as general manager, and therefore plaintiff has not the right to complain of defendant's act. May v. Johnson, 13 La. App. 521, 128 So. 540." See, also, Haley Grocery Co. v. Haley, 8 Wash. 75, 35 P. 595; Cool v. McDill, 38 Ind. App. 621, 78 N. E. 679; Annotation, 93 A. L. R. 125.

The words set up and establish are substantially synonymous and the ordinary meaning of them is to bring into being, to create, to originate, or to set up. They do not usually refer to something that already exists. 30 C. J. S., Establish, p. 1229, says this in reference to the word establish: "In its primary sense, it has been defined as meaning to bring into being, create, or originate; * * * to set up; but not to acquire something which has already been brought into existence." See, also, People ex rel. Gill v. Devine Realty Trust, 366 Ill. 418, 9 N. E. 2d 251; Commonwealth v. Cohen, 169 Pa. Super. 84, 82 A. 2d 325; Temple v. City of Petersburg, 182 Va. 418, 29 S. E. 2d 357; 15 Words and Phrases (Perm. ed.), p. 261.

The record in this case does not justify a finding that the covenant, the subject of this inquiry, is operative in the particular circumstances of the alleged disobedience of appellee.

The cross-appeal challenges the correctness of the action of the trial court in disallowing the objection of Wilson T. Adams, appellee, to the participation of the attorneys of appellant in the trial of this case because of a consultation of appellee with C. L. Baskins on February 6, 1950.

The showing in reference to the objection is that appellee consulted C. L. Baskins on that date in reference to the partnership contract between appellant and appellee. He told Mr. Baskins of the contentions between them concerning the rights of appellee because of the contract. It was present and was examined. It is not definitely disclosed what the matter in controversy was at that time except that Mr. Baskins dictated and there

was written on the last sheet of the contract an acknowledgement that on October 1, 1949, appellee had paid to appellant $3,492.40 on the agreed value of the undivided one-third interest of appellee in the business provided for in the contract, and that as of October 1, 1950, the parties to the contract would again make settlement of partnership matters under the contract and the amount of the interest of appellee would be evidenced by another writing attached to the contract. Any matter in issue in this case was not in any way involved in the consultation. Appellee paid Mr. Baskins for his services.

It is a rigid rule necessary to be strictly observed and religiously enforced that when an attorney has once been retained and received the confidence of a client, he may not accept and receive a retainer from or enter the service of another whose interest is adverse to his client in the same controversy or in a matter so closely related thereto as to be in fact a part thereof. It is an inherent virtue of the profession of law that its fidelity to its client can safely be assumed. Any member who proves false to this and places himself in a position to betray any information or facts obtained while employed on one side is guilty of the grossest breach of trust. The lawyer must in all things be true to the trust accepted when he was received into the profession or failing it he must leave the profession or be promptly separated from it. Zimmer v. Gudmundsen, 142 Neb. 260, 5 N. W. 2d 707; State ex rel. Nebraska State Bar Assn. v. Price, 144 Neb. 542, 13 N. W. 2d 714.

The fact that an attorney was incidentally connected with an adverse interest does not of itself disqualify him. He may act for a new client if his interest is not necessarily adverse to those of the former client, and if the attorney is not called upon to use or take advantage of the confidential communications of the former client for the benefit of the new one. The test of inconsistency is not whether the attorney has ever been re-

tained by the party against whom he proposes to appear, but whether the acceptance of a new retainer will make it necessary or convenient in advancing the cause of his new client to do anything which will injuriously affect his former client, and whether he will be obligated in the new relationship to use against his first client information received because of the former employment. An attorney is not barred from representing a subsequent client against a former client where the duties required of him do not conflict with those involved in the former employment. Musselman v. Barker, 26 Neb. 737, 42 N. W. 759; 5 Am. Jur., Attorneys at Law, § 66, p. 297; 7 C. J. S., Attorney and Client, § 48, p. 827; Annotation, 51 A. L. R. 1312; 1 Thornton on Attorneys at Law, § 175, p. 311, § 176, p. 314.

The judgment of the district court should be and it is affirmed. The cross-appeal should be and it is denied.

AFFIRMED.