MIDLANDS TRANSPORTATION COMPANY, A CORPORATION, APPELLEE, v. APPLE LINES, INC., A CORPORATION, APPELLANT.
197 N. W. 2d 646

Filed May 12, 1972. No. 38223.

Stern, Harris, Feldman, Becker & Thompson, for appellant.

Nelson, Harding, Marchetti, Leonard & Tate and Kermit A. Brashear, II, for appellee.

Heard before WHITE, C. J., BOSLAUGH, McCOWN, and CLINTON, JJ., and WARREN, District Judge.

WHITE, C. J.

This is a suit on a promissory note, but the real issue presented is the sufficiency of the evidence to submit the questions of liability and damages to a jury for the alleged breach by the plaintiff of a covenant not to compete with the defendant. These issues were raised by the cross-petition of the defendant and the district court, holding that there was insufficient evidence to submit the case to a jury, directed a verdict for the plaintiff on the promissory note originally sued upon. We affirm the judgment of the district court.

The controversy here rose on an agreement by Apple Lines, Inc., hereinafter referred to as Apple, to purchase a portion of an I. C. C. Certificate of Public Convenience and Necessity held by Midlands Transportation Company, hereinafter referred to as Midlands. Apple paid $5,000 when the agreement was made, in May 1967, and executed a negotiable promissory note for $22,000 for the balance of the purchase price. Apple

was a petroleum products carrier from Kansas City, Missouri, north to Omaha, Nebraska. The purchase of Midlands' authority was to make the return trip south to Kansas City more profitable by trucking malt beverages from Omaha south to the Kansas City area. After a period of operation on a grant of temporary authority, the I. C. C. approved the agreement and the transfer of the relevant portion of Midlands' certificate was made. Midlands also agreed that it would not compete with Apple in the transportation of any commodity in any area covered by the transferred authority for a period of 5 years from the date of the transfer.

Was there competent evidence to submit the issue of damages on Apple's cross-petition? The proper measure of damages with regard to breach of a covenant not to compete was established by this court in Gallagher v. Vogel, 157 Neb. 670, 61 N. W. 2d 245 (1953), wherein it was said: "Speaking broadly, the amount recoverable for breach of an agreement by the seller of a business not to engage in competition with the buyer is the loss which the latter has sustained, naturally resulting from the breach.

"The general rule is that the party injured by a breach of contract is entitled to recover all of his damages, including gains prevented, as well as losses sustained, provided they are certain and such as might naturally be expected to follow the breach. See Western Union Tel. Co. v. Wilhelm, 48 Neb. 910, 67 N. W. 870." Admittedly, damages in such a case cannot be proved with mathematical certainty. There must be some basis for computation of either a general loss to the business or a loss of profits. Apparently, from the pleadings, the cross-petitioner, Apple, asserts both aspects in its theory of recovery. In a quite recent case, relied upon by Apple in its brief, this court said as follows as to the measure of damages in an action for the loss of goodwill: "In an action at law for the loss of goodwill, the evidence must contain *sufficient*

*data to enable a jury, with a reasonable degree of certainty and exactness,* to estimate the actual damages." (Emphasis supplied.) Frank H. Gibson, Inc. v. Omaha Coffee Co., 179 Neb. 169, 137 N. W. 2d 701.

The case of McGinnis v. Hardgrove, 163 Mo. App. 20, 145 S. W. 512 (1912), was concerned with an action against a seller for violation of an agreement not to compete in a livery business. Plaintiff testified that his gross receipts amounted to $8 to $10 a day before defendant began to compete but that subsequent to such competition his gross receipts amounted to only $4 or $5 a day. There was no evidence as to plaintiff's business expense except the fact that he merely paid expenses when his gross receipts diminished. With language extremely applicable to the instant situation the court discussed the plaintiff's burden in such an instance: "Plaintiff must not only show in such a case his right of recovery but the elements and facts which compose the measure of his recovery and not leave the jury to rove without guide or compass through the limitless fields of conjecture and speculation."

Summarizing these authorities the more precise question before us is not whether there is any competent evidence in the record to show that the damages are capable of mathematically exact measurement, but whether there is sufficient evidence and data to enable the trier of fact, the jury, with a reasonable degree of certainty and exactness to estimate the actual damages. Turning to the record we find that there is evidence that Midlands' gross income from the operation of the malt beverage authority was approximated, but that there is no competent evidence anywhere in the record as to Apple's gross income from said operation either prior to or after the effects of the alleged breach of the contract not to compete. The damage which Midlands' was allegedly responsible for was based primarily on the loss of a major user of Midlands' services soon after the sale to Apple. Without producing any

records or books of the company, Apple's general manager testified that the loss of this customer reduced Apple's gross income "about $650 per week" from sometime near the end of 1967 until the trial date of June 3, 1971. However, the record shows that the same witness went on to testify that Apple had continued to operate under the beverage authority with other customers and had made a profit, but due to the destruction of the company records in an untimely fire, he could not testify as to the amount or the extent of the profits from the whole malt beverage operation. There was also evidence that Apple invested in new refrigerated trailer units. There is no evidence of pecuniary loss, no dollar figures to show any degree of loss on this investment, and none at all to show any direct connection with the claimed loss of the one customer due to the breach of the covenant not to compete. Summarizing, the only competent evidence in terms of dollars is that Apple realized approximately $650 gross per week from servicing the Schatz account and that it spent approximately $80,000 for the acquisition of new refrigerated trailer units to be utilized *generally* in its common carrier business. More precisely, and in accordance with the trial court's finding on this issue, the record is wholly void of any basis for arriving at the most elementary computation as to the difference between Midlands' per annum gross in the operation of the malt beverage authority and Apple's per annum gross in the operation of the same. On the other hand, the testimony of Apple's general manager substantiated the fact that the malt beverage authority purchased from Midlands was operated at a profit. It is clear that the additional essential facts necessary to a computation of damages are not present in the record. The evidence does not reflect the present gross of Apple in the operation of the malt beverage authority. And, while acknowledging that it realized a profit, there is no evidence in the record showing in

dollar figures what such profit was. More important, nowhere in the evidence are Apple's expenses or any delineation of the relationship between overhead and gross presented; nor is there any evidence of the present value of the equipment which Apple claims to have purchased for the purpose of the operation of the malt beverage authority. Nothing but conjecture or speculation could guide the jury in making any determination as to how and in what manner the acquired equipment is used in relationship to the other aspects of Apple's common carrier business. We observe further that nowhere in the record does there appear any rational method or basis for the computation of Apple's claimed damage. The jury would be left to pure speculation to find the loss of the Schatz account as being the proximate cause of any unknown and unproved yet pecuniary loss, either a general one or from loss of profits.

It is true that Apple was prevented from the proper presentation of its case on damages due to the fact that the relevant documents and evidence were lost when fire destroyed the company office building. This explains but obviously does not excuse Apple's failure to sustain its burden of proof on the issue of damages. It is the duty of the district court to refrain from submitting to a jury the issue of damages when the evidence is such that it cannot determine such issue except by indulging in speculation and conjecture. Johnsen v. Taylor, 169 Neb. 280, 99 N. W. 2d 254. To submit the issue of damages in this case to the jury would be to "leave the jury to rove without guide or compass through the limitless fields of conjecture and speculation." See McGinnis v. Hardgrove, *supra*. The determination of the trial court not to submit Apple's cross-petition to the jury is sustained on this ground alone.

We turn to the issue of liability. The evidence adduced by Apple clearly establishes that no more than

one truck at a time that was titled in the name of "Midlands" was leased by it to a competing common carrier with malt beverage authority from November 13, 1967, to July 21, 1968, which period of time was approximately subsequent to the loss of the Schatz account by Apple.

It appears that the majority and proper rule is that the mere leasing of personal property, without proof of other circumstances, by a covenantor to an existing competitor of a promisee, does not constitute a breach of a general covenant not to compete. Apple premises its argument mainly upon the case of Dowd v. Bryce, 95 Cal. App. 2d 644, 213 P. 2d 500, 14 A. L. R. 2d 1329, and J. D. Nichols Stores, Inc. v. Lipschutz, 120 Ohio App. 286, 201 N. E. 2d 898. We feel that the better rule, both on reason and authority, is stated in the later case of Wineteer v. Kite, 397 S. W. 2d 752 (Mo. App., 1965), wherein the court in discussing the Dowd and the Nichols cases said as follows: "Although it was clearly obvious to the court that sales of land were expressly barred by the covenant and that the lesser act of leasing could have well been implied to be a prohibited act, the court did not choose to make its determination on that basis. Instead, it reached the conclusion that the parties did not intend that plaintiff would be permitted to lease his property for the purpose of competition *on the independent ground that such lease constituted indirect competition.*

"On its face the Dowd opinion appears to be supporting authority in defendants' favor. However, the decision of the court, founded as it is on the basis of competition instead of the clearly expressed covenant restriction against selling, has been criticized in 14 A. L. R. 2d 1333, Annotation, Contract Not to Compete - Lease, by editorial comment reading in part as follows:

" 'There can be hardly any doubt that the decision in Dowd v. Bryce * * * is correct under the circumstances. The inclusion in the restrictive covenant of the provi-

sion against selling other property to future competitors shows the intention of the parties as to the scope of the prohibited activities clearly. It is more difficult, however, to justify the decision on the ground that the lease amounts to indirect competition by the lessor. While the arguments advanced by the court in favor of this viewpoint are of considerable force, the decision seems to go further in restricting the seller in his business activities than most cases involving similar situations. * * * Thus, it has been held generally that there is no breach of the covenant where the covenantor *merely lends money to a person engaged in a similar business, or where or where the covenantor sells land to another who erects a building thereon for the purpose of carrying on the business.* On the other hand there is a breach of the covenant where the covenantor engages in the business as a partner, *organizes a competing corporation, or otherwise engages in a similar business under corporate form, or takes active interest in the encouragement of the business in other ways.*

" 'Without endeavoring to lay down any general principles it may be suggested *that only such conduct by the covenantor constitutes a breach of the agreement which amounts to an active participation on his part in the running of the competitive business even though this activity is conducted by indirect means.*'

"We have found only one instance in which the Dowd case has been approved or followed as authority on the specific question here considered. In the Ohio Case, J. D. Nichols Stores v. Lipschutz, 120 Ohio App. 286, 201 N. E. 2d 898, the court adopted the reasoning of Dowd and also held that a seller of a business violates his agreement to refrain from competition, per se, and without any other act on his part, by leasing other premises for purposes of a similar business. In its effect this holding amounts to an extension or redeclaration of the Dowd case ruling and would be subject to the same

critical examination that the Dowd result has undergone." (Emphasis supplied.)

In accord with the authority and reasoning of the Wineteer case, see Adams v. Adams, 156 Neb. 778, 58 N. W. 2d 172; Ericson v. Jayette, 149 Fla. 82, 5 So. 2d 453; McKeighan Wachter Co. v. Swanson, 138 Wash. 682, 245 P. 10, affirmed on rehearing, 141 Wash. 694, 250 P. 353; Houston Transfer & Carriage Co. v. Williams, 201 S. W. 712 (Tex. Civ. App., 1918), reversed on other grounds, 221 S. W. 1081 (Tex. Comm. App., 1920); Management, Inc. v. Schassberger, 39 Wash. 2d 321, 235 P. 2d 293.

In Nebraska, although we have no case directly on the question of whether a lease to a competitor constitutes a breach of a covenant not to compete, our court in Adams v. Adams, *supra,* stated the correct approach to the interpretation of a covenant restricting competitive freedom, when it stated as follows: "A contract restraining a person from establishing a business competitive with that of the other party to it is strictly construed and doubts are resolved against the latitudinarian construction thereof."

As we have pointed out, basically, Apple relies solely upon the leasing of equipment to an active competitor, in order to sustain its claim of the breach of an agreement to not compete. There is no evidence to show that Midlands organized a competing corporation, or directly or indirectly engaged in a similar business under corporate form, or otherwise took an active interest in the encouragement of the competitive business. Though each case must be judged upon its particular facts and circumstances, it is clear that generally the mere lease of personal property by covenantor to a previously existing competitor of the covenantee does not constitute a violation of a general covenant not to compete. Accordingly, we hold in this case that the contention the lease of the equipment to an active competitor was a violation of a covenant not to compete must fall and the trial

court's direction of a verdict on the cross-petition is sustainable on this ground alone.

The district court correctly determined that the defenses and alleged set-off of Apple are without merit as a matter of law. Accordingly, Midlands' motion for a directed verdict as to its petition and motion to dismiss as to Apple's cross-petition were properly sustained and the motion for summary judgment on the promissory note was correctly granted thereafter. The judgment of the district court is correct and is affirmed.

AFFIRMED.